Confidential Loan Corp. v. Commissioner.
Confidential Loan Corp. v. Commissioner
Docket No. 59890.
United States Tax Court
T.C. Memo 1957-21; 1957 Tax Ct. Memo LEXIS 229; 16 T.C.M. (CCH) 99; T.C.M. (RIA) 57021; January 31, 1957
Lee N. Steiner, Esq., for the petitioner. Colin C. Macdonald, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion KERN, Judge: Respondent determined deficiencies in Federal income taxes against petitioner for the fiscal years ended June 30, 1952, and June 30, 1953, in the respective amounts of $335.24 and $150. Petitioner alleged error on the part of respondent with regard to such determination and, in addition, claims overpayments of such taxes in the amount of $2,272.50 for the year ended June 30, 1952, and in the amount of $1,242.79 for the year ended June 30, 1953. One issue has been abandoned by the petitioner. The sole issue before us is whether sums paid by petitioner as dividends on its preferred stock were deductible as interest paid on an indebtedness *230 pursuant to section 23(b) of the Internal Revenue Code of 1939. [Findings of Fact] A complete stipulation of facts has been filed herein, and we find the facts to be as stipulated. In substance, the stipulated facts are as follows: Petitioner was organized under the laws of the State of New York on May 17, 1950, with its principal place of business at Long Island City, New York. It is a personal credit agency doing business as a licensed lender in the State of New York pursuant to Article IX of the State Banking Law. By its certificate of incorporation the petitioner was authorized to issue 1,000 shares no-par-value common stock. The opening journal entry of the corporation was as follows: Cash
$50,000
Capital stock
36,000
Paid in surplus
14,000 Three hundred and sixty shares of common stock, represented by the above entry, were issued by the petitioner to the following persons in the following amounts: Albert Roth
252
Monroe Thonet
36
Milton Stern
36
Lee N. Steiner and Roslyn
Roth Steiner
36
On October 2, 1950, Frank E. and Helen B. Hallam jointly purchased 36 shares of petitioner's common stock for $5,000. The petitioner, *231 on its books, credited $3,600 of the purchase price to capital stock and the balance of $1,400 to capital surplus. There were no further changes in the ownership of the common stock of the petitioner until August 15, 1952. On November 1, 1950, Roth gave Lee N. Steiner, Frank E. Hallam, and Milton Stern conditional options to purchase certain of his common stock over a period of 5 years at its book value but not less than $138.88 per share. Petitioner issued its promissory notes for moneys loaned to it by Albert Roth and Alma Roth (wife of Albert Roth) on the dates and in the amounts listed below: October 2, 1950
$25,000
October 17, 1950
25,000
November 3, 1950
25,000
December 6, 1950
25,000
January 29, 1951
25,000
March 26, 1951
25,000 These notes were payable 5 years after the dates thereof. On or about February 1951, the petitioner entered into negotiations for an unsecured credit line of $75,000 with The Peoples Industrial Bank (now Manufacturers Trust Company), 855 Avenue of the Americas, New York, New York. Due to the excessive debt structure of the petitioner, represented by the notes held by Albert Roth, the bank refused the credit line unless *232 Albert Roth subordinated his notes to the bank. On March 17, 1951, a meeting was called of the board of directors and all the shareholders of the outstanding stock of the petitioner corporation for the purpose of amending its certificate of incorporation to authorize the issuance of 3,000 shares of preferred stock. A resolution to this effect was adopted which set forth the designations, preferences, privileges, and voting powers of the preferred and common stock issues of petitioner as follows: "FOURTH: The total number of shares that may be issued by the Corporation is Four Thousand (4,000), of which Three Thousand (3,000) shares of the par value of One Hundred ($100.00) Dollars shall be preferred and One thousand shares shall be common, without par value. "The designations, preferences, privileges and voting powers or restrictions or qualifications of the shares of each class are as follows: "The holders of the shares of Preferred Stock shall be entitled to receive, and the corporation shall be bound to pay thereon, preferential cumulative dividends, as and when declared by the Board of Directors, out of funds legally available therefor, at the rate of five (5%) per centum *233 per annum, cumulative from the date of issuance and payable annually, on the 1st day of April, or on such days and dates as the Board of Directors shall determine, before any dividends shall be declared or paid upon or set apart for the holders of the shares of Common Stock. "After full dividends at the rate of five per centum (5%) per annum for the then current year, and all previous years, shall have been declared or paid upon or set apart for the holders of the shares of Preferred Stock, additional dividends may be declared or paid or set apart during each year. Such additional dividends, if declared, shall be set apart for or paid exclusively to the holders of the shares of Common Stock, share and share alike. "The corporation, through its Board of Directors and conformable with the provisions of Article III of the Stock Corporate Law, may from time to time redeem the whole or any part of the Preferred Stock at the price of One Hundred Five ($105.00) Dollars per share plus all arrearages of dividends due thereon. The notice of such redemption shall be mailed not less than thirty (30) days prior to the date upon which the stock is to be redeemed to each holder of stock so to *234 be redeemed, at his address as it appears on the books of the corporation. In the event that less than all of the outstanding Preferred Stock of the Corporation is to be redeemed, the amount to be redeemed and the method of effecting such redemption, whether by lot or pro rata or otherwise, may be determined by the Board of Directors. On and after the date fixed for such redemption, the holders of shares so called for redemption shall cease to be entitled to any further dividends and the respective holders thereof shall have no right or interest thereon or therein, by reason of the ownership of such shares, except to receive the said redemption price plus all arrearages of dividends due thereon, without interest upon presentation and surrender of their certificates therefor. "In the event of any liquidation, dissolution or winding up of the corporation, whether voluntary or involuntary, the holders of the shares of Preferred Stock shall be entitled to receive out of the assets of the corporation (whether from capital or surplus or both) the par amount plus a premium of $5.00 per share of each of their preferred shares plus any arrearages of dividends that may be due and unpaid thereon, *235 before any distribution shall be made to the holders of the shares of common stock, and thereafter the holders of the shares of Common stock, shall be entitled to the exclusion of the holders of the shares of Preferred Stock, to share ratably in all assets of the corporation remaining after such payment to the holders of the shares of Preferred Stock. If, upon such liquidation, dissolution or winding up of the corporation, the assets of the corporation shall be insufficient to permit the payment in full to the holders of the shares of Preferred Stock of the amount distributable as aforesaid, then the entire assets of the corporation shall be distributed ratably among the holders of the shares of Preferred Stock. The foregoing provisions of this paragraph shall not, however, be deemed to require the distribution of assets among the holders of shares of Preferred Stock and the holders of the shares of Common Stock in the event of a consolidation, merger, lease or sale, which does not in fact result in the liquidation or winding up of the enterprise. "Except as otherwise required by law or by the provisions in this Article Fourth contained, the entire voting power shall be vested solely *236 and exclusively in the holders of the Common Stock, share and share alike, and the holders of the Preferred Stock shall have no voting power and shall not have the right to participate in any meeting of stockholders and the holders of the Preferred Stock shall have no right to vote in a proceeding for mortgaging the property and franchises of the corporation pursuant to section sixteen of the Stock Corporation Law, for authorizing any guaranty pursuant to section ninetteen [nineteen] of said law, for the sale of the franchises and property of the corporation pursuant to section twenty of said law, for consolidation pursuant to section eighty-six or section ninety-one of said law, for voluntary dissolution pursuant to section one hundred and five of said law, or for change of corporate name pursuant to the General Corporation Law or pursuant to section thirty-five of the Stock Corporation Law." On March 30, 1951, the petitioner, over the signature of its president, Frank E. Hallam, issued written offers to sell 1,000 shares of its preferred stock to Albert Roth and 500 shares of said stock to Mrs. Albert (Alma) Roth at par value of $100 per share subject to certain terms and conditions *237 as set forth therein. The letter to Albert Roth reads as follows: "We understand that you are considering the purchase of 1,000 shares of our Preferred Stock at its par value of $100.00 per share providing that the stock which you propose to purchase is retired over a period of twelve years at $105.00 per share. "We further understand that you will only purchase said Preferred Stock if it is retired in accordance with the following schedule: "Number
of Shares
Date to be Retired
15
April 1, 1952
30
April 1, 1953
45
April 1, 1954
60
April 1, 1955
75
April 1, 1956
90
April 1, 1957
105
April 1, 1958
105
April 1, 1959
120
April 1, 1960
120
April 1, 1961
135
April 1, 1962
100
April 1, 1963
"We further understand that you would have no objection to our retiring any or all of the 1,000 shares of Preferred Stock which you may purchase at any dates prior to the dates set forth in the above schedule, so that the above schedule sets forth the maximum amount of time in which the shares are to be retired. "As a further inducement to your proposed purchase, the corporation will agree that if upon any time it defaults in its retirement of the preferred *238 stock as herein set forth in the above schedule, you may, upon ten days written notice to the corporation, demand that all of your stock be retired immediately as soon as there is surplus of the corporation available to do so. "Please be advised, therefore, that at a special meeting of the shareholders and board of directors of the corporation, the above retirement program was approved. "You may consider the provisions for the retirement program hereinbefore set forth and the other contents of this letter as an offer made to induce you to purchase the 1,000 shares of our preferred stock at its par value. This offer shall expire on April 15, 1951 and is to be accepted by your purchase of the preferred stock. Should you so accept this offer by purchasing the preferred stock, all of the terms of this letter are to be considered as an agreement. "Said agreement "Said agreement shall be binding upon our assigns and successors in interest, and shall inure to the benefit of your heirs, administrators, executors and assigns. Furthermore, said agreement shall be interpreted under the Laws of the State of New York and no waiver or modification of same shall be valid unless it is in writing *239 and signed by you or your heirs, executors or assigns." A similar letter was written to Mrs. Roth calling for the retirement of 35 shares in 1963, 150 shares in 1964 and 1965, and 165 shares in 1966. On March 31, 1951, the petitioner issued, for par value, 1,000 shares of preferred stock to Albert Roth and 500 shares of preferred stock to Alma Roth. The preferred stock certificates set forth the designations, preferences, privileges, and voting powers or restrictions or qualifications of both the preferred and common stock issues of the petitioner in conformity with the resolution of the corporation quoted above. On April 2, 1951, the promissory notes payable to Albert and Alma Roth were paid in full by the petitioner, with interest. Subsequently, the petitioner again applied to The Peoples Industrial Bank for an unsecured credit line and the bank, under the petitioner's new capital structure, approved a line of credit, unsecured, in the amount of $75,000 on May 25, 1951. The petitioner filed its original income tax returns for the fiscal years ended June 30, 1952, and June 30, 1953, with the district director, internal revenue service, Brooklyn, New York, on September 9, 1952, and *240 September 14, 1953, respectively. These returns were filed on the cash basis of accounting and stated thereon in "Schedule M - Reconciliation of Net Income and Analysis of Earned Surplus and Undivided Profits" that cash dividends of $7,575 (should be $7,500 dividends and $75 premium on preferred stock retirement) were distributed for the fiscal year ended June 30, 1952, and cash dividends of $7,425 and a premium on preferred stock retirement of $150 were distributed for the fiscal year ended June 30, 1953. Also, on these returns in "Schedule L - Balance Sheets" the capital stock section included preferred stock in the amounts of $150,000, $148,000, and $145,500 as of July 1, 1951, June 30, 1952, and June 30, 1953, respectively. In addition, on the original return filed for the fiscal year ended June 30, 1953, in "Schedule EP-4 - Excess Profits Credit Based on Invested Capital," the petitioner, in computing its equity capital at the beginning of the year and its average borrowed capital for the year ended June 30, 1953, did not include in this computation any amount of preferred stock. As part of the credit the petitioner listed in its "Schedule EP-4" a distribution out of capital represented *241 by retirement of preferred stock on April 1, 1953, in the amount of $3,150. On February 19, 1954, the petitioner filed an amended return for the fiscal year ended June 30, 1953, with the district director, internal revenue service, Brooklyn, New York, wherein it now labeled the previously stated preferred stock in "Schedule M" and and "Schedule EP-4" as bonds payable and a part of the equity and borrowed capital, respectively. In addition, the petitioner therein claimed the previously stated dividends and premium paid on the retirement of preferred stock, totaling $7,575, as deductible interest. [Opinion] Petitioner's contention that the preferred stock issued by it to the Roths represented an indebtedness and that the dividends paid thereon constituted deductible interest is based principally upon the provisions of the agreements embodied in the letters of March 30, 1951, whereby petitioner was obligated to retire this stock at fixed dates in the future. Petitioner argues that the "unqualified obligation to pay the principal at fixed maturity dates in the reasonable future" is the characteristic of an indebtedness and compels the conclusion that the preferred stock was not *242 an investment, and that the dividends were in reality interest payments. However, in Charles L. Huisking & Co., 4 T.C. 595, we held that a definite maturity date specified in securities, while a factor to be considered, is not decisive of the problem before us since "it is not unusual for preferred stock to have a maturity or retirement date." In that case, in spite of the definite maturity date specified in the securities there involved, we concluded that they were "more nearly like preferred stock than indebtedness" because they "are unsecured and are subordinated to the claims of all creditors of the petitioner and the payment of interest is not absolute." For the same reasons, and because of the additional factor that the circumstances of the issuance of the preferred stock and the subsequent treatment of it on its books and returns indicated an intention on the part of petitioner that it represent a stock interest rather than an indebtedness, we conclude that petitioner's preferred stock was what it purported to be and was not an indebtedness, and that the dividends paid thereon did not *243 constitute interest on an indebtedness deductible under any provision of the Internal Revenue Code. Petitioner also contends that since Roth was originally a creditor of petitioner and his notes were paid with the proceeds of the preferred stock, the stock should be considered as a substitute for and equivalent to the original indebtedness. This argument overlooks the fact that the very purpose of issuing the preferred stock was to eliminate Roth's debt from petitioner's balance sheet and substitute therefor a preferred stock interest in order to facilitate borrowing from outside sources. The obvious intent of all the parties to the transaction was to change the relationship of Roth to the petitioner from that of creditor to that of a stockholder. We have considered this argument and find that it is without merit. Decision will be entered for respondent.